[No. 30498. Department Two. August 19, 1948.]

ALASKA STEAMSHIP COMPANY *et al., Respondents,* v. THE STATE OF WASHINGTON *et al., Appellants.*[1]

*The Attorney General* and *Philip W. Richardson, Assistant,* for appellants.

*Merritt, Summers & Bucey* and *Lane Summers,* for respondents.

[1] Reported in 196 P. (2d) 1001.

BEALS, J.—Petitioner (plaintiff) Alaska Steamship Company is a corporation organized and existing under the laws of the state of Nevada, having its principal place of business in the city of Seattle.

Petitioner Yu Chung Steamship Company, Ltd., is a corporation organized and existing under the laws of the Republic of China, having its principal place of business in the city of Shanghai.

Petitioner American Minerals & Transport Corporation is a corporation organized and existing under the laws of the state of New York, having its principal place of business in New York City.

Petitioner Alaska Steamship Company (herein referred to as Alaska), proposing to sell its steamship "Derblay" to petitioner Yu Chung Steamship Company, Ltd. (herein referred to as Yu Chung), requested the United States maritime commission to approve and permit the sale of the above-named steamship to Yu Chung, the ship to be transferred from United States flag and registry to Chinese flag and registry.

The proposed sale having been approved July 30, 1946, and permission granted by the maritime commission, Alaska, as vendor, September 30, 1946, at Verona, New Jersey, in consideration of $210,000 to it paid, as the purchase price of the ship, executed and delivered to Yu Chung, as vendee, through the latter's agent, American Minerals & Transport Corporation, a bill of sale conveying title to the steamship from the vendor to the vendee. Possession of the steamship was delivered to vendee's agent above named, September 30, 1946, at Seattle, Washington.

October 1, 1946, the permanent United States registry of the ship was surrendered to and canceled by the United States collector of customs at Seattle for transfer of the steamship to Chinese flag and registry, pursuant to order No. C-4463 of the United States maritime commission. On the date last mentioned, the master of the steamship, acting on behalf of Yu Chung, signed articles with the ship's crew, who were largely Chinese, for a voyage to terminate at a Chinese port.

October 4, 1946, pursuant to the order of the maritime commission above referred to, the vice-consul of the. Republic of China, in New York, issued a certificate of registration and nationality of the steamship, placing the same under Chinese flag and registry, the ship being designated by the name "Yu Chung," Yu Chung Steamship Company, Ltd., owner.

December 5, 1946, the ship having been unable to load, at Seattle, a cargo of coal, because of strikes of deck officers, longshoremen, and others, clearance for the sailing of the ship was obtained from the United States collector of customs at Seattle, and, on the afternoon of the same day, the ship left Seattle on its voyage to China.

November 15, 1946, the sum of $6,300, representing three per cent sales tax on the sale of the steamship, was paid, under protest, to the state of Washington and its tax commission, through Alaska, as vendor, for Yu Chung, as vendee, by American Minerals & Transport Corporation, as the latter's agent.

Thereafter, the petitioners, contending that, by the transaction above described, the steamship was exported from the United States to the Republic of China; that, because of the sale, the ship could not be legally used or operated in waters of the state of Washington or of the United States, except solely as an incident to foreign commerce, and that, consequently, the payment above referred to and the retention of the money by the state tax commission were illegal, as in violation of Art. I, § 10, clause 2, of the United States constitution, demanded of the members of the tax commission a refund of the amount paid, together with interest.

Their demand having been refused, petitioners appealed to the superior court of the state of Washington from the ruling of the tax commission, by their attorneys issued a summons to members of the tax commission, and filed a bond in support of their appeal.

In due time, the respondents, members of the tax commission of the state of Washington, filed their answer denying, upon information and belief, most of the facts alleged in the petition, admitting the sale of the ship, as above set

forth, and the collection of the sales tax above referred to, and, as an affirmative defense, alleging that, pursuant to the laws of the state of Washington, the tax collected was due, as an incident to the sale of the ship.

The matter was presented to the superior court upon a written "stipulation of facts," stating as facts the occurrences above described, stating that the steamship referred to had lost status as a domestic vessel and had acquired status as a foreign vessel, thereby having become ineligible for registration as a vessel of the United States, and ineligible for use and operation in waters of the United States, and stating the respective contentions of the petitioners and of the respondent tax commissioners, the former claiming that they were entitled to a refund of the money paid by way of a sales tax, and the respondents claiming that the tax had been rightfully and lawfully collected and retained.

The trial resulted in the entry of findings of fact and conclusions of law in favor of petitioners, the findings adopting the stipulated facts, with the exception of No. 19, being the last portion of the stipulation, in which the parties stated their respective contentions.

The court concluded that petitioners were illegally required to pay a sales tax on the sale of the steamship, and were entitled to a refund of the amount which they had paid, together with interest.

Judgment was entered in accordance with the findings of fact and conclusions of law, granting petitioners judgment against the state of Washington and the tax commission of the state of Washington, composed of the persons named in the title hereof, for the sum of $6,300, together with interest.

From this judgment, the state of Washington and the state tax commission have appealed to this court.

Appellants' assignments of error are based upon the trial court's ruling that appellants' action, in levying and collecting a sales tax upon the sale of the steamship "Derblay" by respondent Alaska to respondent Yu Chung, was illegal, as being in violation of Art. I, § 10, clause 2, of the constitution of the United States, and upon the entry of judgment in

favor of respondents and against appellants for the return of the amount paid by respondents, under protest, in compliance with appellants' demand.

From the stipulation of facts, it appears, in addition to the statements above made, that respondent Alaska has been engaged in the business of operating steamships between Puget Sound and Alaskan ports; that the stockholders of respondent Yu Chung are not citizens of the United States, and that this respondent is not qualified, under the laws of the state of Washington, to engage in business therein; that respondent American Minerals & Transport Corporation has not qualified itself to engage in business in the state of Washington; that, on or about July 9, 1946, respondent Alaska, as seller, and respondent Yu Chung, as buyer, entered into a written contract for the future sale of the steamship "Derblay," the contract including the following provisions:

" 'This agreement of sale is at all times subject to the following conditions limitations upon the obligations of the Seller to perform hereunder:

" '(a) The redelivery of said vessel to the Seller by the War Shipping Administration, the bareboat charterer of said vessel;

" '(b) The approval of the sale of said vessel and the transfer to Chinese flag by the United States Maritime Commission;' "

that, September 26, 1946, at Seattle, Washington, the steamship "Derblay" was redelivered to respondent Alaska by the war shipping administration (United States maritime commission), as bareboat charterer.

Paragraphs Nos. 14, 15, and 16, of the stipulation of facts, read as follows:

"(14) That although applicable statute and regulations thereunder (U. S. Code Title 15, § 173, 174, 176, 177; Code of Federal Regulations Title 15, Chapter I, Part 30 and Chapter III, Part 305, § 305.30, sub-section (2) effective June 21, 1940) required that export declaration (Form 7525-V) covering said steamship be prepared and filed with the Collector of Customs before his clearance of said steamship, by inadvertence and oversight such export declaration was neither so prepared or filed nor demanded by the Collector of Customs as a condition precedent to clearance, in compliance

with law; but that after clearance of said steamship, on the 11th day of August, 1947, such verified export declaration was prepared in behalf of Yu Chung Steamship Company, Ltd. and filed with the Collector of Customs, declaring said steamship as an export and naming Shanghai, China, as the final destination thereof. That in ordinary practice such export declaration would not be filed until the day before clearance.

"(15) That on the afternoon of the 5th day of December, 1946, said steamship, having continued unable to load said cargo, departed from Seattle on said voyage terminating in China.

"(16) That said steamship has lost status as a domestic vessel and has acquired status as a foreign vessel; that by such change of status said steamship became ineligible for reregistration as a vessel of the United States and ineligible for use and operation in the waters of the State of Washington or of the United States except solely as a mere incident to foreign commerce of the foreign owner."

Respondent Alaska, as petitioner, together with other parties, prosecuted appeals from two other orders of the state tax commission, in cases involving questions similar to those presented in the case at bar. The cases were heard together before the superior court, and similar judgments entered in each. While separate appeals were prosecuted to this court, a consolidated brief was filed in all three appeals, and the cases were argued together. The record on appeal in each case is before this court upon an agreed statement of facts, approved by the trial judge, pursuant to Rule of Supreme Court 10, 18 Wn. (2d) 11-a.

The parties to this litigation are to be commended for their adoption of the procedure followed, both before the superior court and before this court.

Respondents rely upon two portions of the constitution of the United States, which read as follows:

Art. I, § 9, clause 5 (limiting the powers of Congress): "No tax or duty shall be laid on articles exported from any state."

Art. I, § 10, clause 2: "No state shall, without the consent of the congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and

imposts, laid by any state on imports or exports, shall be for the use of the treasury of the United States; and all such laws shall be subject to the revision and control of the congress."

In the case at bar, we are concerned with the exercise of the power of taxation by a state; and, therefore, Art. I, § 10, clause 2, is the applicable portion of the United States constitution.

The supreme court of the United States has held that, in construing the clause, its meaning is identical with Art. I, § 9, clause 5, *supra,* in so far, at least, as questions here presented are concerned. *Turpin v. Burgess,* 117 U. S. 504, 29 L. Ed. 988, 6 S. Ct. 835; *Cornell v. Coyne,* 192 U. S. 418, 48 L. Ed. 504, 24 S. Ct. 383. In view of this fact, cases construing both provisions of the United States constitution may be considered.

Statutes of the state of Washington relied upon by appellants, and pursuant to which appellants levied and collected the sales tax in question, are the following:

Laws of 1943, chapter 156, § 5, p. 499, Rem. Supp. 1943, § 8370-16 [P.P.C. § 982-3]: "From and after the first day of May, 1943, there is hereby levied and there shall be collected a tax on each retail sale in this state equal to three per cent of the selling price. . . ."

Laws of 1941, chapter 76, § 3, p. 195, Rem. Supp. 1941, § 8370-21 [P.P.C. § 982-13]: "The tax hereby imposed shall be paid by the buyer to the seller, and it shall be the duty of each seller to collect from the buyer the full amount of the tax payable in respect to each taxable sale. . . ."

Laws of 1945, chapter 249, § 5, p. 743, Rem. Supp. 1945, § 8370-19: "The tax hereby levied shall not apply to the following sales: . . .

"(d) Sales which the State of Washington is prohibited from taxing under the constitution of this state or the constitution or laws of the United States; . . ."

■ If, by the tax commission of this state, a sales tax be levied upon the sale of merchandise which is, in fact, an export, the tax is void, as repugnant to Art. I, § 10, clause 2, of the United States constitution, *supra. Richfield Oil Corp. v. State Board of Equalization,* 329 U. S. 69, 91 L. Ed. 80, 67 S. Ct. 156.

The question to be here determined is whether the sale of the steamship by respondent Alaska to respondent Yu Chung was, in law, the sale of export property, within the provisions of the United States constitution quoted above.

■ It is, of course, true, as argued by appellants, that statutes of a state, enacted for the purpose of raising revenue, are presumed to be constitutional, and that any claim of exemption of property from taxation thereunder should be studied with care by a court before rendering a decision which deprives a state of a portion of its revenues. *Von Hamm-Young Co. v. City and County of San Francisco,* 170 P. (2d) (Cal. App.) 940.

Appellants argue that the respondents in this case should be required to pay the sales tax demanded and received by the tax commission, and that the trial court erred in rendering judgment in respondents' favor for the return of the amount paid.

It may be noted that appellants admit that, if the steamship had been delivered to the vendee in British Columbia or elsewhere, beyond the maritime jurisdiction of the United States, the transaction would have constituted a sale for export, and that no sales tax would have been due; but contend that a contrary result should follow because the sale of the ship was consummated in the state of Washington and delivery to the vendee made therein.

Appellants contend that the process of exportation commences with the final movement of property from the state; that the movement must be continuous, and that it is by virtue of the transportation and commitment to a common carrier, rather than by the intent of the owner, that the property becomes an export and exempt from taxation.

In the case at bar, the property sold was a steamship, and moved from the territorial limits of the United States under its own power.

■ There is no valid ground for any discrimination against exporters, nor is property exempt from the tax unless it is sold as an export. Such an excise tax as that with which we are here concerned, is conditioned upon a

local activity. *McGoldrick v. Berwind-White Mining Co.,* 309 U. S. 33, 84 L. Ed. 565, 60 S. Ct. 388, 128 A. L. R. 876.

■ The taxing power of a state is one of its attributes of sovereignty and may be exercised at the discretion of the state, subject to constitutional limitations. *Nathan v. Louisiana,* 49 U. S. 74 (8 Howard 73), 12 L. Ed. 992.

It is appellants' position that the Washington retail sales tax is nondiscriminatory as to exports and applies in all cases of retail sales of tangible personal property consummated in this state and is, therefore, free from challenge as being a burden upon foreign commerce; that the only sales transaction, where delivery of the property sold is made within this state, upon which the sales tax may not be collected, is one in which the property sold is delivered to a carrier within this state for export, as, in such a case, the exportation process commences upon the delivery of the property to the carrier, and that, for this reason, no sales tax may be collected.

In the case of *Turpin v. Burgess, supra,* it was held that a Federal excise tax on tobacco, manufactured with the intention to export the same, levied before the removal of the tobacco from the factory, should be paid. Referring to the goods sought to be taxed, the court said:

"They were not in course of exportation; they might never be exported; whether they would be or not would depend altogether on the will of the manufacturer."

In the case of *Cornell v. Coyne, supra,* it appeared that cheese was manufactured in this country under a contract to export. In holding that a Federal tax on the manufacture of filled cheese should be paid, the court said:

"The true construction of the constitutional provision is that no burden by way of tax or duty can be cast upon the exportation of articles, and does not mean that articles exported are relieved from the prior ordinary burdens of taxation which rest upon all property similarly situated."

In *Peck & Co. v. Lowe,* 247 U. S. 165, 62 L. Ed. 1049, 38 S. Ct. 432, it was held that the net income of a corporation, derived from export of its goods, was subject to tax as not being a burden on articles exported from the state.

In *Crew Levick Co. v. Pennsylvania,* 245 U. S. 292, 62 L. Ed. 295, 38 S. Ct. 126, it was held that a state tax levied on the business of selling goods in foreign countries, the tax being measured by a percentage of the entire business transacted, amounted to a burden on foreign commerce and was an impost or duty on exports, and, therefore, uncollectible.

In *Spalding & Bros. v. Edwards,* 262 U. S. 66, 67 L. Ed. 865, 43 S. Ct. 485, it was held that a tax on the sale of baseball equipment, sold by a manufacturer to a commission house in New York, on order of a purchaser residing in Venezuela, was invalid for the reason that the tax attempted to be collected was on a sale which was a step in the course of the exportation of the goods. It should be noted that the sale was not made by the manufacturer directly to the foreign purchaser, but was made, upon the latter's order, to a New York commission firm, which delivered the goods to a carrier, with a bill of lading addressed to the purchaser in Venezuela. The court, speaking through Mr. Justice Holmes, stated:

"The question is whether the sale was a step in exportation, assuming as appears to be the fact, that the title passed at the moment when the goods were delivered into the carrier's hands."

In the course of its opinion, the court said:

"The very act that passed the title and that would have incurred the tax had the transaction been domestic, committed the goods to the carrier that was to take them across the sea, for the purpose of export and with the direction to the foreign port upon the goods. The expected and accomplished effect of the act was to start them for that port. The fact that further acts were to be done before the goods would get to sea does not matter so long as they were only the regular steps to the contemplated result. Getting the bill of lading stands no differently from putting the goods on board ship. Neither does it matter that the title was in Scholtz & Co. and that theoretically they might change their mind and retain the bats and balls for their own use. There was not the slightest probability of any such change and it did not occur. The purchase by Scholtz & Co. was solely for the purpose of Delgado & Cia. and for their account and risk. Theoretical possibilities may be left out of account."

In the recent case of *Richfield Oil Corp. v. State Board of Equalization, supra,* it appeared that the corporation was engaged in the business of producing and selling oil in California and, by contract entered into within that state, sold a quantity of oil to a purchaser residing in New Zealand, delivery to be made to the purchaser's tanker in a California port, and payment for the oil to be made in London, England. The oil was piped from the California refinery to the corporation's storage tanks on the harbor, from which it was pumped into the purchaser's tanker, title to the oil then passing to the purchaser. A bill of lading was delivered to the master of the ship, designating the corporation as the shipper and consigning the oil to a named representative of the purchaser in New Zealand. The California authorities levied a general retail sales tax upon the transaction, based upon the gross receipts. The tax was paid by the corporation, under protest, and refund claimed in an appropriate action.

The supreme court of California granted judgment in favor of the corporation (155 P. (2d) (Cal.) 1) but, upon a rehearing, reversed its prior decision and held that the tax was valid (27 Cal. (2d) 150, 163 P. (2d) 1).

Upon appeal to the supreme court of the United States, the judgment of the supreme court of California was reversed, the supreme court holding that the tax levied was in violation of the export clause of the Federal constitution.

The California court, in its final decision, relied largely upon cases in which it was held that such a tax was valid under the commerce clause of the Federal constitution, and applied the same rule in the case then before the court.

We quote from the opinion of the supreme court of the United States as follows:

"The two constitutional provisions, while related, are not coterminous. To be sure, a state tax has at times been held unconstitutional both under the Import-Export Clause and under the Commerce Clause. *Brown v. Maryland,* 12 Wheat. 419; *Crew Levick Co. v. Pennsylvania,* 245 U. S. 292. But there are important differences between the two. The invalidity of one derives from the prohibition of taxation on

the import or export; the validity of the other turns nowise on whether the article was, or had ever been, an import or export. See *Hooven & Allison Co. v. Evatt,* 324 U. S. 652, 665-66, and cases cited. Moreover, the Commerce Clause is cast, not in terms of a prohibition against taxes, but in terms of a power on the part of Congress to regulate commerce. It is well established that the Commerce Clause is a limitation upon the power of the States, even in absence of action by Congress. *Southern Pacific Co. v. Arizona,* 325 U. S. 761; *Morgan v. Virginia,* 328 U. S. 373. But the scope of the limitation has been determined by the Court in an effort to maintain an area of trade free from state interference and at the same time to make interstate commerce pay its way. As recently stated in *McGoldrick v. Berwind-White Coal Mining Co., supra,* p. 48, the law under the Commerce Clause has been fashioned by the Court in an effort 'to reconcile competing constitutional demands, that commerce between the states shall not be unduly impeded by state action, and that the power to lay taxes for the support of state government shall not be unduly curtailed.' That accommodation has been made by upholding taxes designed to make interstate commerce bear a fair share of the cost of the local government from which it receives benefits (see e. g. *Western Live Stock v. Bureau of Revenue,* 303 U. S. 250, 254-55, and cases cited; *McGoldrick v. Berwind-White Coal Mining Co., supra*) and by invalidating those which discriminate against interstate commerce, which impose a levy for the privilege of doing it, which place an undue burden on it. *Adams Mfg. Co. v. Storen,* 304 U. S. 307; *Gwin, White & Prince, Inc. v. Henneford,* 305 U. S. 434; *Best & Co. v. Maxwell,* 311 U. S. 454; *Nippert v. Richmond,* 327 U. S. 416.

"It seems clear that we cannot write any such qualifications into the Import-Export Clause. It prohibits every State from laying 'any' tax on imports or exports without the consent of Congress. Only one exception is created—'except what may be absolutely necessary for executing its inspection Laws.' The fact of a single exception suggests that no other qualification of the absolute prohibition was intended. It would entail a substantial revision of the Import-Export Clause to substitute for the prohibition against 'any' tax a prohibition against 'any discriminatory' tax. As we shall see, the question as to what is exportation is somewhat entwined with the question as to what is interstate commerce. But the two clauses, though complementary, serve different ends. And the limitations of one cannot be read into the other.

"It is suggested, however, that the history of the Import-Export Clause shows that it was designed to prevent discriminatory taxes and not to preclude the levy of general taxes applicable alike to all goods. . . . We cannot, therefore, read the prohibition against 'any' tax on exports as containing an implied qualification."

The supreme court considered the facts in the case before it and determined that foreign commerce was involved, as it was conceded that the oil was sold for shipment abroad.

The court then discussed the question whether, at the time the tax accrued, the oil was in export and, after discussing several authorities, said:

"The questions remain whether we have here an export within the meaning of the constitutional provision and, if so, whether this tax was a prohibited impost upon it.

"The requirement that foreign commerce be involved (*Woodruff v. Parham,* 8 Wall. 123, 136) is met, for concededly the oil was sold for shipment abroad. The question whether at the time the tax accrued the oil was an export presents a different problem. . . .

"The certainty that the goods are headed to sea and that the process of exportation has started may normally be best evidenced by the fact that they have been delivered to a common carrier for that purpose. But the same degree of certainty may exist though no common carrier is involved. The present case is an excellent illustration. The foreign purchaser furnished the ship to carry the oil abroad. Delivery was made into the hold of the vessel from the vendor's tanks located at the dock. That delivery marked the commencement of the movement of the oil abroad. It is true, as the Supreme Court of California observed, that at the time of the delivery the vessel was in California waters and was not bound for its destination until it started to move from the port. But when the oil was pumped into the hold of the vessel, it passed into the control of a foreign purchaser and there was nothing equivocal in the transaction which created even a probability that the oil would be diverted to domestic use. It would not be clearer that the oil had started upon its export journey had it been delivered to a common carrier at an inland point. The means of shipment are unimportant so long as the certainty of the foreign destination is plain."

The court next considered whether or not the assessment of the California sales tax constituted a violation of the ex-

port clause in the Federal constitution and, after stating that the supreme court of California held that the tax was an excise tax for the privilege of conducting a retail business, measured by the gross receipts from sales, and so forth, said:

"That construction, being a matter of state law, is binding on us. But it is not determinative of the question whether the tax deprives the taxpayer of a federal right. That issue turns not on the characterization which the state has given the tax, but on its operation and effect. See *St. Louis Southwestern Ry. Co. v. Arkansas*, 235 U. S. 350, 362; *Kansas City, Ft. S. & M. R. Co. v. Kansas*, 240 U. S. 227, 231.

"Appellee concedes that the prohibition of the Import-Export Clause would be violated if the goods were taxed as exports or because of their exportation, or if the process of exportation were itself taxed. We perceive, however, no difference in substance between any tax so labeled and the present tax. The California Supreme Court conceded that the delivery of the oil 'resulted in the passage of title, and the completion of the sale, and the taxable incident.' 27 Cal. 2d p. 153, 163 P. 2d pp. 2-3. The incident which gave rise to the accrual of the tax was a step in the export process.

. . .

"The prohibition contained in the Import-Export Clause against taxation on exports clearly involves more than a mere exemption from taxes laid specifically upon the exported goods themselves. That is true of the constitutional prohibition against federal taxes on exports. *United States v. Hvoslef, supra* [237 U. S. 1]. What was said there (p. 13) is equally applicable here: 'If it meant no more than that, the obstructions to exportation which it was the purpose to prevent could readily be set up by legislation nominally conforming to the constitutional restriction but in effect overriding it.' "

The supreme court concluded

". . . that the tax which California has exacted from appellant is an impost upon an export within the meaning of Article I, Section 10, Clause 2, and is therefore unconstitutional."

The question here presented is novel, as well as important. We find no case in which the right of the state to levy an excise tax, in connection with the sale of merchandise claimed to be an export, concerned property which pro-

ceeded, as an export, beyond the territorial limits of the state and of the United States under its own power. The decisions concern the commitment of property to and its transportation by a common carrier for export.

It should be noted that, in the case of *Spalding & Bros. v. Edwards, supra,* the supreme court refused to consider important the fact that, theoretically, the destination of the property sold might be changed and the merchandise not exported. The same possibility was referred to and disregarded in the case of *Richfield Oil Corp. v. State Board of Equalization, supra.*

In the case at bar, certain preliminary proceedings were required, prior to the sale of the steamship by Alaska to Yu Chung. Before the sale could be consummated, it was necessary to procure the approval of the United States maritime commission and permission from that authority to transfer the flag and registry of the ship to the foreign flag and registry. The application for and acceptance of this permission definitely indicated Alaska's intention to sell the ship as export property and to place the vessel under foreign registry, and, before the permanent United States registration could be surrendered and canceled and a new certificate of registry and nationality issued, the steamship had to be conveyed to the foreign owner by bill of sale.

Soon after the permission was granted by the above authority, the purchase price was paid, a bill of sale was delivered, and possession of the ship was turned over to the vendee's agent at Seattle. The next day, the United States registry of the ship was surrendered to and canceled by the Federal authorities, and the master of the steamship, on behalf of Yu Chung, signed articles with the ship's crew for a voyage to terminate at a Chinese port. Three days later, a certificate of foreign registry and nationality was issued by the Chinese vice-consul in New York, and the vessel formally placed under the Chinese flag and registry.

After these steps had been taken, the steamship could no longer engage in domestic commerce, save, of course, as an incident to foreign trade.

Soon thereafter, the ship, having been unable to take a cargo on board, was cleared by the United States collector of customs at Seattle and immediately left the territorial waters of the United States on its voyage to China.

The taking of these steps, in orderly sequence and without undue delay, beyond question disclosed the mutual intent of the parties, respectively, to sell and purchase the steamship as export property. From the date Alaska applied to the United States maritime commission for approval of the sale and permission to transfer the flag and registry, the ship was at least as formally dedicated as an export as ordinary merchandise would be so dedicated by delivery to an inland carrier for export at some port of embarkation.

In its opinion in the *Richfield Oil Corporation* case, *supra,* the supreme court held that Art. I, § 10, clause 2, of the constitution of the United States, the import-export clause, was not subject to some limitations which might be applied to the commerce clause of the constitution; that the oil, upon the sale of which the state of California sought to collect an excise tax, was, in fact, an export, and that the levy constituted an impost upon an export, in violation of the constitution of the United States.

The unusual circumstance here present, that the steamship itself is the property exported, is unimportant in applying the constitutional provision. Seagoing vessels are personal property and subject to sale, as are other articles of commerce. They are, of course, subject to Federal laws concerning registry, sale, and so forth.

Appellants argue that, in the case at bar, the facts disclose no actual committal of the steamship to exportation until after the vessel had been sold and delivered. As above stated, the record shows the contrary to be the case.

By applying to the United States maritime commission for approval of the sale of the ship to Yu Chung, Alaska did everything that it could do to show its intention to sell the ship as an export. All subsequent proceedings clearly followed the same plan, until final consummation of the transaction by the departure of the steamship from waters of the

United States, under foreign registry and flag. In connection with the sale, no commitment of the property by a bill of lading, as in the case of delivery of ordinary merchandise to a common carrier, was possible.

The sale of the steamship "Derblay," by respondent Alaska Steamship Company, a corporation, to respondent Yu Chung Steamship Company, Ltd., a corporation, constituted a sale of property for export, and the trial court was correct in holding that the appellant state of Washington, through its tax commission composed of appellants H. H. Henneford, T. M. Jenner, and T. S. Hedges, unlawfully collected the sales tax above referred to upon the sale, and that the respondents before this court were entitled to recover from the state of Washington, and the other appellants, the sum of $6,300, which they had paid pursuant to the demand of appellant tax commissioners, together with interest thereon from November 15, 1946.

The judgment appealed from is, accordingly, affirmed.

MALLERY, C. J., STEINERT, ROBINSON, and JEFFERS, JJ., concur.