[Civ. No. 8556.    Third Dist.    Oct. 27, 1955.]

MATSON   NAVIGATION   COMPANY   (a   Corporation),
    Respondent, v. STATE BOARD OF EQUALIZATION,
    Appellant.

Edmund G. Brown, Attorney General, James E. Sabine and Irving H. Perluss, Assistant Attorneys General, and Charles J. Miller, Deputy Attorney General, for Appellant.

Brobeck, Phleger & Harrison for Respondent.

FINLEY, J. pro tem.*—This appeal is from a portion of a judgment of the superior court in favor of plaintiff and respondent Matson Navigation Company, a corporation, and against the State Board of Equalization of the State of California, defendant and appellant. The action was brought to recover taxes alleged to have been improperly assessed under the Sales and Use Tax Law. (Rev. & Tax. Code, § 6001 et seq.)

The principal question for decision is whether the sale by plaintiff, a California corporation, of the S.S. Matsonia, an ocean-going passenger vessel docked in a California port, to a foreign purchaser was a transaction exempt from sales tax by virtue of the import-export clause contained in article I, section 10, clause 2, of the Constitution of the United States. Plaintiff also contends that the sale of the S.S. Matsonia was an "occasional sale" exempt under the provisions of sections 6006.5 and 6367 of the Revenue and Taxation Code.

Plaintiff has been for many years a carrier of freight and passengers, principally between California and Hawaii, and in 1948 owned a large fleet of freighters and two passenger liners, the Lurline and Matsonia. The sale in 1948 of the Matsonia is the source of this dispute. At that time the vessels was about 21 years old, had been used by the government for five years during the war, and, when returned, was badly deteriorated and in need of extensive repair. Plaintiff decided to restore the Lurline and determined that the economically useful life of the Matsonia had ended because of inroads of air transportation upon surface travel and the large amount of restoration and repair needed.

The Matsonia was offered for sale to domestic operators,

*Assigned by Chairman of Judicial Council.

but there were none interested. It was then offered to foreign buyers. In January, 1948, negotiations were entered into with Panamanian Lines, Inc., a corporation organized under Republic of Panama laws, which was wholly owned by non-resident aliens and which has never done business in California. Both parties intended at and prior to the sale of the Matsonia that it should be registered as a foreign vessel upon such sale and taken from the United States to Italy. These dealings resulted in a contract of sale between plaintiff and Panamanian on July 13, 1948, following which, on July 15th, plaintiff applied to the United States Maritime Commission for approval of such sale. Approval was granted on September 24, 1948. Title 46, United States Code, section 808, made mandatory the approval by the Maritime Commission of any such sale to foreign owners or a transfer to foreign registry.

Delay by the commission in approving the flag transfer, and the 1948 San Francisco waterfront strike, resulted in extension of the time for delivery. On December 15, 1948, title was transferred by a bill of sale delivered in New Jersey, and at the same time and place the consideration passed. On the same day, physical possession of the vessel was given to Panamanian in San Francisco, and the vessel was registered as a Panamanian vessel with the San Francisco Panamanian Consul. On December 16, 1948, plaintiff filed with the Collector of Customs a declaration of the Matsonia as an export, as required by federal law and regulations, i. e., title 15, United States Code, section 173, and title 15, chapter 1, part 30, section 30.30(d) ((2), Code of Federal Regulations. On the same day her American Certificate of Enrollment was surrendered to the Collector of Customs. Federal law required prompt surrender of American registration (46 U.S.C., § 23) under penalty of forfeiture of the vessel (46 U.S.C., § 41). Upon sale to foreign owners, the Matsonia was legally disabled from ever thereafter engaging in domestic trade. (46 U.S.C., § 883.)

On December 22, 1948, Panamanian signed on a foreign crew and the Matsonia sailed for Italy with neither cargo nor passengers. Since being repaired and outfitted in Genoa, Italy, the Matsonia has not returned to California, but has been used in trans-Atlantic trade.

Plaintiff is engaged in the transportation business and is not a ship merchant. The Matsonia was acquired for the transportation business and was sold when her useful life

had ended. From 1942 through 1945, plaintiff sold no vessels. From 1946 to the time of trial in 1953 plaintiff sold 14 freighters and one barge in addition to the Matsonia, for a total price of $3,721,325. These sales were made within the period from April, 1946, to May, 1949. Each of the ships sold was about 20 years of age and some were substantially older. All had been used in the war and suffered considerable depreciation incident thereto, and therefore were disposed of as soon after war service as they could be replaced by newer equipment. Plaintiff generally considered the normal useful life of such ships to be 20 years, and at the time of their acquisition contemplated they would be resold at the end of such useful life unless sooner scrapped or lost at sea. Of vessels other than the above referred to acquired during the 1920's, three were sold for scrap and three were lost at sea for reasons other than war service. All of these ships were acquired for use in plaintiff's operations and not for resale.

Although it was not so specifically found, the record supports an inference that the reason for this apparently large number of sales in a three-year period was that the normal process of replacement of obsolete and worn-out equipment was interrupted by the extraordinary demands of wartime service resulting in an abnormal accumulation.

During the entire period under consideration, the Matsonia was berthed at Pier 34, San Francisco, and plaintiff held no state sales tax permit for that location, although it did hold several other such permits for other locations for purposes of retail sales of such things as tobacco, candy, liquor and vessels' stores, and for scrap sales at Wilmington, California.

The issues before us may be summarized a follows: (1) Is a large commercial transocean passenger steamship of American registry such an object as can in legal contemplation be considered or treated as an article of export; (2) If it can be, is it to be so considered and treated where it is sold to a foreign purchaser for use in international trade; (3) If it can be and is sold as an export to a foreign purchaser for such use, at what point does the transaction come under the protective mantle of the export clause of the United States Constitution; and, (4) If under the factual situation of this case the sale is not one to be considered as a sale into export trade and therefore not exempt from the provisions of the California Sales Tax Act, is it nevertheless to be considered as an occasional sale and exempt from levy of the sales tax for that reason?

It is quite apparent that if question No. 1 above is to be answered in the negative, questions (2) and (3) become moot. Appellants contend that it must be so answered, but neither their authorities nor their logic seem convincing. The United States Constitution is silent on the subject and the legal authorities cited do not support appellant's position. No cogent reason has been advanced why an article of conveyance once having been used as a common carrier is thereby or thereafter to be quarantined as an article of commerce or foreign export. Appellant makes this observation: "It is the difference between an article of commerce and an instrumentality of commerce." This comment directs attention to a distinction rather than a difference, a distinction which has not, so far as we can see, the slightest legal significance. It must be remembered that, generally speaking, each and every piece of equipment in the world's transportation system was an article of commerce between the time the manufacturer relinquished title and the operator acquired it. We cannot see how or why the legal character of such an article could or should be changed by the mere circumstances of its use for a time as an "instrumentality of commerce." Appellant seeks to inject here the question of consumability, arguing that the ordinary articles of commerce exported to foreign countries are *consumed* there and that the possibility is at least remote that they would ever again be returned in the course of commerce to the country of origin. This argument seems without merit for certainly there is no legal prohibition against the export of imperishable articles of utility which might conceivably find their way back into domestic use. It is customarily presumed, it is true, that in the ordinary course of events they will not and it is further true perhaps that they do not. Appellant refers to *A. G. Spaulding & Bros.* v. *Edwards,* 262 U.S. 66 [43 S.Ct. 485, 67 L.Ed. 865]; and to *Richfield Oil Corp.* v. *State Board of Equalization,* 329 U.S. 69 [67 S.Ct. 156, 91 L.Ed. 80], and cites baseball bats and oil as examples of consumable goods. Certainly the possibility that oil once sold as an export will ever again reenter the field of domestic commerce is much more remote than in the case of the baseball bats referred to in the Spalding case. But it seems to us that in either case, remote though the possibility may be, there still remains a possibility, while in the case of the Matsonia there is none by reason of the Federal prohibition against a vessel once sold into foreign registry ever again engaging in domestic commerce. The

element of consumption of goods exported may be a factor, but only a factor of assurance against the return of such goods into domestic commerce. The identity of baseball bats and oil might conceivably be hidden, but we cannot conceive the same with relation to a large ocean-going vessel.

The case of *The Conqueror*, 166 U.S. 110 [17 S.Ct. 510, 41 L.Ed. 937], is cited by appellant for the proposition that a vessel is not an article of commerce but is treated as *sui generis*. An American citizen bought a yacht in England and brought it to New York where the Collector of Customs sought to levy a tariff duty. The owner claimed that the ship was not an "article" within the meaning of the applicable tariff act. The court upheld the owner's contention but no constitutional question was presented or decided, only a question of statutory interpretation. The holding of the case was that the vessel was not an "article," "goods" or "merchandise" within the meaning of the tariff act because so far as that and other tariff acts were concerned vessels were not treated as dutiable articles but always had been the subject of a separate and entirely different set of laws and taxes relating to vessels alone. If this be the rule then appellant has not shown by what authority an object not an "article," "goods" or "merchandise" and not recognizable as an object of export can nevertheless be subjected to the California sales tax. It is true that under the act the tax is on the transaction or sale rather than on the object, but we do not believe that it was ever intended by the Legislature that the sale of an object can be taxed, though that object may not be considered as an article of commerce or export.

The identical proposition under discussion was considered and rejected in the case of *Alaska Steamship Co.* v. *State of Washington* (1948), 31 Wn.2d 328 [196 P.2d 1001, 1009-1010]. The court said:

"The question here presented is novel, as well as important. We find no case in which the right of the state to levy an excise tax, in connection with the sale of merchandise claimed to be an export, concerned property which proceeded, as an export, beyond the territorial limits of the state and of the United States under its own power.

. . . . . . . . . .

"The unusual circumstance here present, that the steamship itself is the property exported, is unimportant in applying the constitutional provision. Seagoing vessels are personal

property and subject to sale, as are other articles of commerce. They are, of course, subject to Federal laws concerning registry, sale, and so forth.''

We agree with this conclusion by the Supreme Court of Washington. No logical reason has been advanced by appellant to the contrary. ■ We hold, therefore, that the Matsonia was a proper object of export. We hold further that by reason of her sale to Panamanian Lines, Inc., a foreign corporation organized under the laws of the Republic of Panama, the vessel was sold as an export into export trade. ■ The word ''export'' as used in the Constitution and laws of the United States prohibiting taxes on ''exports'' generally means the transportation of goods from the United States to a foreign state or country. (*West India Oil Co.* v. *Sancho* (C.A.A., Puerto Rico), 108 F.2d 144, 147.) ■ ''Exportation'' means a severance of goods from the mass of things belonging to the United States with intention of limiting them to the mass of things belonging to some foreign country. (*United States* v. *200 Watches* (Dist.Ct., N.Y.), 66 F.Supp. 228, 230.) ■ Another country as the intended destination of the goods is essential to the idea of exportation. (*Swan & Finch Co.* v. *United States,* 190 U.S. 143 [23 S.Ct. 702, 47 L.Ed. 984]; *Kidd* v. *Flagler,* 54 F. 367, 369.) ■ To ''export'' means to carry or *send* abroad. (*Canton R. Co.* v. *Rogan,* 340 U.S. 511 [71 S.Ct. 447, 95 L.Ed. 488, 20 A.L.R.2d 145].) ■ The Matsonia was sold, delivered and became a part of the mass of goods and property subject to the laws of the Republic of Panama. She was thereby irrevocably committed to foreign trade if not to foreign ownership, for under the provisions of the United States Code, title 46, section 883, she could never again engage in United States coastwise trade.

The question next to be answered is, was she sufficiently committed into the stream of export trade at the time of sale so that the transaction would not be subject to the California sales tax? Appellant maintains that she was not exempt because the sale or transaction was completed before export began. This argument is untenable, for as in the case of *Richfield Oil Corp.* v. *State Board of Equalization, supra,* the act claimed to be subject to the tax is the very act which passed title and which would have incurred the tax had the transaction been domestic. For all practical purposes the same acts both in the Richfield Oil case and in the present case extinguished United States dominion over the subject

matter of sale and at the same time invested it in a foreign power. A different principle is involved than in *Empresa Siderurgica, S. A.* v. *County of Merced*, 337 U.S. 154 [69 S.Ct. 995, 93 L.Ed. 1276], for the tax in question there was an ad valorem tax on the goods involved while there still was no sufficiently positive or certain or irrevocable commitment of those goods into the export stream. The transaction had not yet advanced the goods involved to a position where they were actually subject to dominion by a foreign country nor were they in the ordinary course of events certain to so become. As was said by the court in *Cornell* v. *Coyne*, 192 U.S. 418 [24 S.Ct. 383, 48 L.Ed. 504]:

". . . The true construction of the constitutional provision is that no burden by way of tax or duty can be cast upon the exportation of articles, and does not mean that articles exported are relieved from the prior ordinary burdens of taxation which rest upon all property similarly situated. The exemption attaches to the export and not to the article before its exportation."

The Richfield case presented a different situation from either the Cornell or Empresa case, for in the Richfield case the oil was not sought to be subjected to an ad valorem tax along with all other taxable property similarly situated, but as in the present case a sales tax was sought to be levied. Oil was pumped by the seller into the hold of a foreign ship which is deemed for many purposes to be a segment of the country of its registry. It thereby passed into the control of a foreign purchaser and for many purposes under the dominion of a foreign land. The chances were extremely remote to say the least that it would ever be pumped out again on an American shore. As was stated in the opinion, at page 83:

". . . That delivery marked the commencement of the movement of the oil abroad. It is true, as the Supreme Court of California observed, that at the time of the delivery the vessel was in California waters and was not bound for its destination until it started to move from the port. But when the oil was pumped into the hold of the vessel, it passed into the control of a foreign purchaser and there was nothing equivocal in the transaction which created even a probability that the oil would be diverted to domestic use. It would not be clearer that the oil had started upon its export journey had it been delivered to a common carrier at an inland point. The means of shipment are unimportant so long as the certainty of the foreign destination is plain."

Here, even more than in the Richfield case, exportation was made more and more certain as each step took place in the procedure necessary to transfer title and registry to a foreign purchaser. The sale was not a completed transaction until each and every step had been completed. ■ Under the California Sales Tax Act the levy of the tax is on the completed sale and not on the several steps which may enter into or be necessary to its completion. Therefore, when the entire transaction was completed and as title to the ship passed, the event became an accomplished fact which, except for the constitutional prohibition, would have activated the law and given birth to the tax. But the completion of that very act constituted the vessel the property of a foreign purchaser and placed her under the jurisdiction of a foreign power.

■ We concur in the reasoning and agree with the Supreme Court of Washington in holding that the completed sale of an ocean-going vessel to a foreign owner, including the change of registry and flag, constitutes an exportation of the ship and that a tax levied upon the sale constitutes an impost upon an export within the meaning of article I, section 10, clause 2, of the United States Constitution and is, therefore, invalid.

In view of this determination it will be unnecessary to pass upon the question of whether sale of the Matsonia constituted an occasional sale under the provisions of the California Sales Tax Act.

The judgment is affirmed.

Van Dyke, P. J., and Schottky, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 21, 1955. Edmonds, J., and Carter, J., were of the opinion that the petition should be granted.