[Sac. No. 7576. In Bank. June 6, 1966.]

SHELL OIL COMPANY, Plaintiff and Appellant, v. STATE BOARD OF EQUALIZATION et al., Defendants and Respondents.

716

Graham, James & Rolph, Robert D. Mackenzie and John M. Collette for Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, and John J. Klee, Jr., Deputy Attorney General, for Defendants and Respondents.

PEEK, J.—The Shell Oil Company seeks a refund of taxes collected from it pursuant to the California Sales and Use Tax Law[1] based upon sales of bunker fuel oil to vessels engaged in interstate and foreign commerce. It contends that the tax is prohibited under the import-export and commerce clauses of the United States Constitution.

The import-export clause provides: "No State shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws. . . ." (U.S. Const., art. I, § 10, cl. 2.)

The commerce clause provides that Congress shall have the power "To regulate Commerce with foreign Nations, and among the several States. . . ." (U.S. Const., art. I, § 8, cl. 3.)

In addition to its foregoing contention, Shell also asserts that the tax is improper under section 6352 of the Revenue and Taxation Code, which exempts from taxation the receipts from sales which the state is prohibited from taxing under the Constitution or laws of the United States or of California. We need not, of course, under the circumstances of this case consider this section independently of our consideration of the import-export and commerce clauses of the federal Constitution.

The vessels, to which the fuel here claimed to have been improperly taxed was sold and delivered, fall into three categories: ships registered in foreign countries and engaged in foreign commerce; ships registered in the United States and engaged in foreign commerce; ships registered in the United States and engaged in interstate commerce. As to all vessels engaged in foreign commerce, Shell contends first that bunker fuel oil is itself an "export" within the meaning of the import-export clause and, second that the tax is an improper levy against the "process of exportation."

As to sales to vessels in any of the categories, Shell asserts that the tax exposes commerce to direct and multiple tax burdens prohibited by the commerce clause of the federal Constitution and that, even were this not so, the tax is precluded because Congress has impliedly occupied the field of taxation of bunker fuel oil sold as ships' stores.

---

[1] Rev. & Tax. Code, § 6001 et seq. Section 6051 provides: "For the privilege of selling tangible personal property at retail a tax is hereby imposed upon all retailers . . . [and applied against] . . . the gross receipts . . . from the sale. . . ." Section 6052 states: "The tax hereby imposed shall be collected from the consumer insofar as it can be done."

The trial court rejected the foregoing contentions and upheld the tax as constitutional as applied to the sales in question. We are persuaded that the trial court has properly resolved the issues presented.

■ Under the import-export clause, a state may not impose a tax against an article of export if the article has commenced its movement abroad and the "certainty of the foreign destination is plain." (*Richfield Oil Corp.* v. *State Board of Equalization* (1946) 329 U.S. 69, 82-83 [67 S.Ct. 156, 91 L.Ed. 80]; *Gough Industries, Inc.* v. *State Board of Equalization* (1959) 51 Cal.2d 746, 748-749 [336 P.2d 161]; see *United States* v. *Hvoslef* (1915) 237 U.S. 1, 13 [35 S.Ct. 459, 59 L.Ed. 813].) In the *Richfield* case oil was shipped to New Zealand with no portion of it being used or consumed in the United States. It was held at page 84 that California's sales tax could not constitutionally be applied, for oil was an export, and its delivery to the hold of the vessel was both "The incident which gave rise to the . . . tax [and] . . . a step in the export process."

The initial issue, therefore, is whether bunker fuel oil, sold for consumption by ships of foreign and domestic registry as they ply the oceans to foreign ports, can be characterized as an article of "export" within the meaning of the import-export clause. While the United States Supreme Court has left open the precise question of whether a "tax upon the sale of . . . oil as ships' stores to vessels engaged in foreign commerce is . . . an impost on . . . exports . . . prohibited by . . . the Constitution" (*McGoldrick* v. *Gulf Oil Corp.* (1940) 309 U.S. 414, 429 [60 S.Ct. 664, 84 L.Ed. 840]), it and other courts have frequently stated that for an article to constitute an export within the meaning of the Constitution it must be intended for a destination in a foreign country. (See *Alaska* v. *Arctic Maid* (1961) 336 U.S. 199, 202 [81 S.Ct. 929, 9 L.Ed.2d 227]; *Richfield Oil Corp.* v. *State Board of Equalization, supra*, 329 U.S. 69, 83; *Dooley* v. *United States* (1901) 183 U.S. 151, 154-155 [22 S.Ct. 62, 46 L.Ed. 128].) ■ For an article to constitute an import it must actually be brought into this country (*Woodruff* v. *Parham* (1868) 75 U.S. (8 Wall.) 123, 131 [19 L.Ed. 382]), and it "is the logical sequence of the case of *Woodruff* v. *Parham*, that the word 'export' should be given a correlative meaning and applied only to goods exported to a foreign country." (*Dooley* v. *United States, supra*, 183 U.S. 151, 154.) Thus, as it would seem unlikely that articles placed aboard ship for use on that vessel during a

voyage to the United States from a foreign land could be deemed imports (cf. *Brown* v. *Maryland* (1827) 25 U.S. (12 Wheat.) 419, 442 [6 L.Ed. 678]), so it would seem equally unlikely that fuel or other consumables utilized during the voyage from the United States to foreign shores could be classified as exports.

Shell relies upon infrequent language in some cases to the effect that because goods are intended for shipment out of the country, and not to return, they become exports. It has been stated that to export is merely to "carry or send abroad." (See *Canton R.R. Co.* v. *Rogan* (1951) 340 U.S. 511, 515 [71 S.Ct. 447, 451, 95 L.Ed. 488, 493, 20 A.L.R.2d 145, 149]; *Matson Nav. Co.* v. *State Board of Equalization* (1955) 136 Cal.App.2d 577, 583 [289 P.2d 73].) A careful examination of these and other cases, however, demonstrates that to constitute an export, an article must not only be "sent abroad" but must be done so with "another country as the intended destination of the goods." (*Matson Nav. Co.* v. *State Board of Equalization, supra,* 136 Cal.App.2d 577, 583; see *Richfield Oil Corp.* v. *State Board of Equalization, supra,* 329 U.S. 69, 83.)

In a situation involving a statutory "drawback" "on the exportation" of an article, the United States Supreme Court held that because oil consumed as ships' stores was not an export, the suppliers of the oil were not entitled to a refund of import duties paid upon the importation of the oil (*Swan & Finch Co.* v. *United States* (1903) 190 U.S. 143 [23 S.Ct. 702, 47 L.Ed. 984].) The court declared that "Whatever primary meaning be indicated by its derivation, *the word 'export' as used in the Constitution* and laws of the United States, generally means the transportation of goods from this *to a foreign country.* . . . '[E]xportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to the mass of things belonging to some foreign country'. . . . *It cannot mean simply a carrying out of the country,* for no one would speak of goods shipped by water from San Francisco to San Diego as 'exported,' although in the voyage they are carried out of the country. *Nor would the mere fact that there was no purpose of return justify the use of the word 'export.'* Coal placed on a steamer in San Francisco to be consumed in propelling that steamer to San Diego would never be so designated. Another country or State as the intended destination of the goods is essential to the idea of exportation." (*Swan & Finch Co.* v. *United States, supra,* 190

U.S. 143, 144-145, *italics added*; cf. *McGoldrick* v. *Gulf Oil Corp., supra*, 309 U.S. 414, at p. 428.)

Shell next argues that at least with respect to ships of foreign registry, the fuel oil constituted an export at the time of delivery, because such vessels are ''foreign territory'' and the oil came within ''foreign dominion'' immediately upon delivery.

The concept that ships of foreign registry are foreign territory is a fiction upon which constitutional issues should not rest, even in part. (See *Cunard S.S. Co.* v. *Mellon* (1923) 262 U.S. 100 [43 S.Ct. 504, 67 L.Ed. 894, 27 A.L.R. 1306]; cf. *Foppiano* v. *Speed* (1905) 199 U.S. 501, 519-520 [28 S.Ct. 138, 50 L.Ed. 288].) Though ''the statement [is] sometimes made that a merchant ship is a part of the territory of the country whose flag she flies. . . . this, as has been aptly observed, is a figure of speech, a metaphor. . . . The jurisdiction which it is intended to describe . . . partakes more of the characteristics of personal than of territorial sovereignty. . . . It is chiefly applicable to ships on the high seas, where there is no territorial sovereign; and as respects ships in foreign territorial waters it has little application beyond what is affirmatively or tacitly permitted by the local sovereign. . . . [The assertion] that a ship is part of the territory of the country whose flag she carries . . . is a fiction. . . .'' (*Cunard S.S. Co.* v. *Mellon, supra*, 262 U.S. at pp. 123-124; cf. *Lauritzen* v. *Larson* (1953) 345 U.S. 571, 585 [73 S.Ct. 921, 97 L.Ed. 1254].)

The logic of the *Swan* case applies equally to all vessels, regardless of the technicality of their registration. An article delivered to a vessel which flies a foreign flag cannot, for that reason alone, be deemed to have been received at a foreign country or destination, and thus to become an ''export'' within the definitions promulgated by the United States Supreme Court.

While a vessel's fuel supply is thus not itself an export in the constitutional sense, nevertheless if a tax on the sale of the fuel is a tax on the ''process of exportation'' the tax would be unconstitutional. '' [I]mmunity runs to the process of exportation and the transactions and documents embraced in it.'' (*Empresa Siderurgica, S.A.* v. *County of Merced* (1949) 337 U.S. 154, 156 [69 S.Ct. 995, 93 L.Ed. 1276].)

The process of exportation, for purposes of both the import-export clause and the prohibition against congressional levies upon exports from any state (U.S. Const., art. I, § 9, cl. 5), begins when goods are ''committed to the common carrier

for transportation out of the State to the State of their destination, or have started on their ultimate passage to that State." (*Coe* v. *Errol* (1886) 116 U.S. 517, 525 [6 S.Ct. 475, 29 L.Ed. 715].) ▆ Once an article has entered upon the process of exportation, the process may no longer constitutionally be taxed by any governmental entity. (See, e.g., *Empresa Siderurgica, S.A.* v. *County of Merced, supra*, 337 U.S. 154; *Richfield Oil Corp.* v. *State Board of Equalization, supra*, 329 U.S. 69.)

In a number of cases, a tax has been held unconstitutional, though not levied upon *articles* of export, because the tax was "the equivalent of a direct tax on the articles." (*Canton R.R. Co.* v. *Rogan, supra*, 340 U.S. 511, 513.) In this category fall a federal stamp tax on foreign bills of lading (*Fairbank* v. *United States* (1901) 181 U.S. 283 [21 S.Ct. 648, 45 L.Ed. 862]), a federal stamp tax on charter parties (*United States* v. *Hvoslef, supra*, 237 U.S. 1), and a stamp tax on policies of marine insurance covering export articles. (*Thames & Mersey Marine Ins. Co.* v. *United States* (1915) 237 U.S. 19 [35 S.Ct. 496, 59 L.Ed. 821].) The court in *Thames & Mersey* stated, at pages 25 to 27, that the question was whether the "tax upon [the insurance policies is] so directly and closely related to the 'process of exporting' that the tax is in substance a tax upon the exportation. . . . The answer must be found in the actual course of trade. . . . It cannot be doubted that insurance during the voyage is . . . an integral part of the exportation. . . . The rise in rates for insurance as immediately affects exporting as an increase in freight rates, and the taxation . . . is as much a burden on exporting as if it were laid on the . . . goods themselves. Such taxation does not deal with . . . distinct or separable subjects; the tax falls upon the exporting process."

Taken literally, the quoted passage might seem to require, as Shell claims, the invalidating of a tax on any product, process or service somehow related to and necessary for exportation. The acceptance of such a contention would "lead back to every forest, mine, and factory in the land and create a zone of tax immunity never before imagined." (*Canton R.R. Co.* v. *Rogan, supra*, 340 U.S. 511, 515.) Such a broad and all-embrasive interpretation of the export clause has never been accepted. (See, e.g., *Canton R.R. Co.* v. *Rogan, supra*, 340 U.S. 511; *Empresa Siderurgica, S.A.* v. *County of Merced, supra*, 337 U.S. 154; *Joy Oil Co.* v. *State Tax Com.* (1949) 337 U.S. 286 [69 S.Ct. 1075, 93 L.Ed. 1366]; *William E. Peck & Co.* v.

*Lowe* (1918) 247 U.S. 165 [38 S.Ct. 432, 62 L.Ed. 1049];
*Cornell* v. *Coyne* (1904) 192 U.S. 418 [24 S.Ct. 383, 48 L.Ed.
504]; *Pittsburgh etc. Coal Co.* v. *Bates* (1895) 156 U.S. 577
[15 S.Ct. 415, 39 L.Ed. 538]; *Coe* v. *Errol, supra*, 116 U.S.
517.) In the *Canton* case a tax measured in large part by the
gross receipts of a common carrier of export freight in the
port city of Baltimore was upheld against import-export
clause challenges. So, too, the court sustained a tax on opera-
tions involving freightage of export goods to the port. (*West-
ern Maryland Ry. Co.* v. *Rogan* (1951) 340 U.S. 520 [71 S.Ct.
450, 451, 95 L.Ed. 501].)

Those cases wherein taxes have been successfully challenged
involved taxes so closely related to particular articles of export
that they may be characterized as the "equivalent of a direct
tax on the articles." (*Canton R.R. Co.* v. *Rogan, supra*, 340
U.S. 511, 513; *United States* v. *Hvoslef, supra*, 237 U.S. 1;
*Thames & Mersey Marine Ins. Co.* v. *United States, supra*, 237
U.S. 19.) ▮ A sales tax levied against bunker fuel oil sold
to a carrier vessel, however, is not related in any manner to
the articles of export which the vessel may carry. The tax does
not vary with the volume or value of the export articles. (See
*Crew Levick Co.* v. *Pennsylvania* (1917) 245 U.S. 292, 297-298
[38 S.Ct. 126, 62 L.Ed. 295].) The amount of tax depends on
the amount of fuel purchased; it will vary with the distance to
be navigated, and will be imposed without regard to whether
the vessel is burdened with export cargo. ▮ "[T]he tax
is not on the *goods*" shipped as exports (*Canton R.R. Co.* v.
*Rogan, supra*, 340 U.S. 511, 514) but on the fuel used to fur-
ther the transportation of such goods, a "distinct or separable
subject" (*Thames & Mersey Marine Ins. Co.* v. *United States,
supra*, 237 U.S. 19, 27), which may be taxed. ▮ "An
article may be an export and immune from tax long before or
long after it reaches the port. But when the tax is on activities
connected with the export or import the range of immunity
cannot be so wide." (*Canton R.R. Co.* v. *Rogan, supra*, 340
U.S. 511, 514-515; cf. *Martin Ship Service Co.* v. *City of Los
Angeles* (1950) 34 Cal.2d 793 [215 P.2d 24].) ▮ Nor is
the tax on the voyage itself; it is imposed on the *sale* of oil,
not on its *use* in foreign commerce. (Cf. *Eastern Air Trans-
port, Inc.* v. *South Carolina Tax Com.* (1932) 285 U.S. 147,
152-153 [52 S.Ct. 340, 76 L.Ed. 673].)

The contention that sales of fuel oil may properly be taxed
under the import-export clause is re-enforced by a considera-
tion of the cases decided under the commerce clause. The com-

merce clause and the import-export clause are by no means "coterminous"; while no tax whatever may be imposed directly against exports, the commerce clause has been interpreted so as to accommodate state powers by upholding taxes "designed to make interstate commerce bear a fair share of the cost of the local government . . . and by invalidating those which discriminate against interstate commerce, which . . . place an undue burden on it. . . . [T]he two clauses, though complimentary, serve different ends. And the limitations of one cannot be read into the other." (*Richfield Oil Corp.* v. *State Board of Equalization, supra,* 329 U.S. 69, 75-76.) Yet when we go beyond the questions of fair burden, or of discrimination, and look to the basic principles, the cases decided under the commerce clause are of obvious relevance in considering issues to be determined under the import-export clause. It is difficult to understand how the tax imposed on the sale of bunker fuel oil could be considered to infringe on the process of exportation under the import-export clause, and yet be so unrelated to the processes of interstate commerce as not to constitute any burden on such commerce within the meaning of the commerce clause.

 The Supreme Court has determined that " 'It is elementary' . . . 'that a State may tax property used to carry on interstate commerce'. . . . [T]he mere purchase of supplies or equipment for use in conducting a business which constitutes interstate commerce is not so identified with that commerce as to make the sale immune from a non-discriminatory tax imposed by the State upon intrastate dealers." (*Eastern Air Transport, Inc.* v. *South Carolina Tax Com., supra,* 285 U.S. 147, 152-153.) In *Eastern Air* the tax was imposed against the sale of fuel to interstate carriers when they were stopped at local airports. Although characterizing the tax as a "license tax," the court concluded at page 152 that even if "such a license tax for the privilege of making sales within the State were regarded as in effect a tax upon the goods sold, its validity could not be so questioned . . . although the property might actually be used in interstate commerce." The tax in question, the court further held, could not be distinguished from taxes held valid and imposed upon the sale of fuel to railroad carriers in interstate commerce, or upon the vehicles of carriage themselves. (See also, *Nathan* v. *Louisiana* (1850) 49 U.S. (8 How.) 73, 80-81 [12 L.Ed. 992]; *Edelman* v. *Boeing Air Transport, Inc.* (1933) 289 U.S. 249, 252 [53 S.Ct. 591, 77 L.Ed. 1155]; *Martin Ship Service Co.* v. *City of Los Angeles, supra,* 34 Cal.2d 793, at p. 799.)

█ For the foregoing reasons we conclude that the instant tax is "a general tax, laid on all property alike, and not levied on goods in course of exportation, nor because of their intended exportation. . . ." (*Turpin & Bro.* v. *Burgess* (1886) 117 U.S. 504, 507 [6 S.Ct. 835, 29 L.Ed. 988].) As a tax levied upon a subject related to but nevertheless distinct and separable from articles of export, the tax does not violate the import-export clause of the federal Constitution under the facts of the instant case.

The taxpayer next asserts that the sales "involve" interstate commerce, because contracts were executed and payments made outside California, and that all of the sales to vessels are exposed to multiple tax burdens. (See *Gwin, White & Prince, Inc.* v. *Henneford* (1938) 305 U.S. 434 [59 S.Ct. 325, 83 L.Ed. 272].)

█ Within prohibited areas of state taxation of interstate commerce is a tax on the *use* of fuel as an instrumentality of interstate commerce, in interstate commerce. (*Helson* v. *Kentucky* (1929) 279 U.S. 245 [49 S.Ct. 279, 73 L.Ed. 683].) But a sales tax imposed generally upon purchases made locally for purposes of consumption is permissible, although the goods had just traveled in interstate commerce. (*McGoldrick* v. *Berwind-White Coal Min. Co.* (1940) 309 U.S. 33 [60 S.Ct. 388, 84 L.Ed. 565, 128 A.L.R. 876].) █ And a tax may be levied upon an intrastate transaction though the article sold or delivered is to be forthwith shipped out of the state. (*Department of Treasury* v. *Wood Preserving Corp.* (1941) 313 U.S. 62, 68 [61 S.Ct. 885, 85 L.Ed. 1188].) Directly in point, of course, is the decision of the Supreme Court upholding the tax on the sale of fuel to airplanes in interstate commerce, discussed above with reference to the import-export clause. (*Eastern Air Transport, Inc.* v. *South Carolina Tax Com., supra*, 385 U.S. 147.) In that case the court pointed out that even were the tax to be considered as levied directly upon the goods sold, "that aspect [of] the tax would be upon a part of the general mass of property within the state and hence subject to the state's authority to tax, although the property might actually be used in interstate commerce." (*Eastern Air Transport, Inc.* v. *South Carolina Tax Com., supra*, 285 U.S. 147, 152.) A state may "validly tax the 'use' to which gasoline is put in withdrawing it from storage within the State, and placing it in the tanks of . . . planes, notwithstanding that its ultimate function is to generate motive power for carrying on interstate commerce. . . . '[so long as the tax] falls short of a tax directly imposed on its use in interstate

commerce.' . . .'' (*Edelman* v. *Boeing Air Transport., Inc., supra,* 289 U.S. 249, 252.)

The tax imposed on the sales of fuel in the instant case was not an unconstitutional burden under the commerce clause, for ''a non-discriminatory tax upon local sales . . . has never been regarded as imposing a direct burden on interstate commerce'' (*Eastern Air Transport, Inc.* v. *South Carolina Tax Com., supra,* 285 U.S. 147, 153; *Henneford* v. *Silas Mason Co.* (1937) 330 U.S. 577, 582-583 [57 S.Ct. 524, 81 L.Ed. 814]), ''notwithstanding that [the] ultimate function [of the fuel] is to generate motive power for carrying on interstate commerce.'' (*Edelman* v. *Boeing Air Transport, Inc., supra,* 289 U.S. 249, 252.)

The taxpayer further asserts that because of the fiction of the territoriality of vessels and because of the home port doctrine of *Hays* v. *Pacific Mail Steamship Co.* (1854) 58 U.S. (17 How.) 596 [15 L.Ed. 254], the vessels here involved are subject to taxation by the state or country of their registry, and that therefore the tax is unconstitutional because the sale might be exposed to multiple burdens. This contention is also without merit.

First, there is no basis, in reality, for the fiction that the ships were foreign territory and that delivery of the fuel oil took place in a state or country outside California. Thus, even though the home port is the situs of the vessels for purposes of the levy of a property tax (see *Hays* v. *Pacific Mail Steamship Co., supra,* 58 U.S. (17 How.) 596), there is no ground under which other states could impose a tax on the identical transactions consummated in California, without violating the commerce and due process clauses of the Constitution. (*Freeman* v. *Hewit* (1946) 329 U.S. 249 [67 S.Ct. 274, 91 L.Ed. 265]; *Miller Bros. Co.* v. *Maryland* (1954) 347 U.S. 340 [74 S.Ct. 535, 98 L.Ed. 744]; *McLeod* v. *J. E. Dilworth Co.* (1944) 322 U.S. 327 [64 S.Ct. 1023, 88 L.Ed. 1304].) For the foregoing reason the Supreme Court was not troubled by any imagined problems of multiple taxation in the *Edelman* and *Eastern Air* cases where taxes nearly identical to the tax imposed by California in the instant case were upheld. As to the vessels registered abroad, Shell has failed to demonstrate that it has ever been the concern of any United States jurisdiction in construing the commerce clause that a foreign country might arbitrarily impose a tax on sales in the United States to one of its citizens, or to ships carrying its flag. In asserting that California may not tax such sales Shell's argument ''er-

roneously attributes to such taxation the risk of discrimination. Actually it is attributable to the freedom of foreign countries, not permitted to our own states, to adopt rules of their own that can result in multiple burdens.　　The court cannot prevent foreign countries from taxing instrumentalities of foreign commerce owned by their domiciliaries. . . . It is without power to compel independent nations to adopt a uniform nondiscriminatory system of taxation. It does not follow that the states must forego the power to impose taxes that are not in themselves discriminatory.'' (*Scandinavian Airlines System, Inc.* v. *County of Los Angeles* (1961) 56 Cal.2d 11, 44-45 [14 Cal.Rptr. 25, 363 P.2d 25], Traynor, J., dissenting.)

Moreover, even were it true that the sale in California could be taxed by the state of the vessel's registry, or that taxes levied by a foreign country were a concern of the courts in determining the validity of a state tax under the commerce clause, appellant has failed to demonstrate that the sale is in fact subject to multiple burdens.　　The abstract possibility that duplicative taxes might be levied by another jurisdiction against the identical transactions, is not the concern of the courts in determinations made under the commerce clause. '' '[T]axpayers must show that the formula places a burden upon interstate commerce in a constitutional sense.' Appellant has not done this. It has not demonstrated what definite burden, in a constitutional sense, the St. Louis tax places on the identical interstate shipments by which Washington measures its tax. . . . And further, it has not been shown that Oregon levies any tax on appellant's activity bearing on Washington sales. In such cases we have refrained from passing on the question of 'multiple taxation,' . . . and we adhere to that position.'' (*General Motors Corp.* v. *Washington* (1964) 377 U.S. 436, 449 [84 S.Ct. 1564, 12 L.Ed.2d 430]; see *Southern Pac. Co.* v. *Gallagher* (1939) 306 U.S. 167, 172 [59 S.Ct. 389, 83 L.Ed. 586].)

The taxpayer finally contends that Congress, in enacting certain statutes, has ''occupied the field'' of taxation of fuel oil sold as ships' stores, and thus impliedly precluded state taxation of such commodities.

''There seems little doubt . . . that under its power over interstate commerce, Congress can fix the bounds of state taxation of that commerce.'' (Hartman, *State Taxation of Corporate Income* (1959) 13 Vand.L.Rev. 21, 122; see *McGoldrick* v. *Gulf Oil Corp., supra,* 309 U.S. 414; cf. *Michigan-Wisconsin Pipe Line Co.* v. *Calvert* (1954) 347 U.S. 157, 165-166 [74

S.Ct. 396, 98 L.Ed. 583].) Although there has been little direct discussion of the limits of federal preclusion with respect to the area of *taxation*, the rules are fairly clear in the area of *regulation* of commerce. When there is a direct conflict between state and federal statutes, or if the subject demands uniformity of regulation, the state statute must fall; the question of implied prohibition, however, is another matter. (See *Kelly* v. *Washington* (1937) 302 U.S. 1, 9 [58 S.Ct. 87, 82 L.Ed. 3].)

 An issue of implied prohibition arises when a federal act impinges on subject matter which a state statute attempts also to regulate, even though there is no direct contradiction between the enactments. ''There is no constitutional rule which compels Congress to occupy the whole field. Congress may circumscribe its regulation and occupy only a limited field. When it does so, state regulation outside that limited field . . . is not forbidden or displaced. . . . [T]he exercise by the State of its police power . . . is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.' '' (*Kelly* v. *Washington, supra,* 302 U.S. 1, 10.) The intent to occupy the field is '' '. . . not to be implied unless the act of Congress fairly interpreted is in actual conflict with the law of the State.' '' (*Huron Cement Co.* v. *Detroit* (1960) 362 U.S. 440, 443 [80 S.Ct. 813, 4 L.Ed.2d 852, 78 A.L.R.2d 1294].) There is no reason to believe that the rule as to the implied occupation of the field of taxation is any more strict; it would indeed be difficult to contend that if Congress has taxed a particular item it thereby precludes a state levy against the same item.

 Appellant relies in part upon section 3451 of the Internal Revenue Code which, at the time of the sales here in question, read, as pertinent: ''Under regulations prescribed . . . no tax under this chapter shall be imposed upon any article sold for use as fuel supplies, ships' stores . . . or legitimate equipment on vessels . . . actually engaged in foreign trade or trade between the Atlantic and Pacific ports of the United States. . . . Articles manufactured or produced with the use of articles upon the importation of which tax has been paid under this chapter, if laden for use as supplies on such vessels, shall be held to be exported for purposes of section 3430. . . .'' The chapter referred to in section 3451 (chapter 29 of the Internal Revenue Code of 1939) was entitled ''Manufacturers' Excise and Import Taxes''; section 3422 of that

chapter imposed a tax upon the importation of petroleum and upon fuel oil and other products derived from such imported petroleum. Additionally, relevant provisions of the Tariff Act of 1930 provide that withdrawals under certain regulations from customs bonded warehouses or internal revenue bonded warehouses of supplies manufactured from certain imported oil and delivered for use by vessels and aircraft engaged in foreign trade are to be exempt from customs duties and internal revenue tax. (19 U.S.C. § 1309.)

In *McGoldrick* v. *Gulf Oil Corp., supra,* 309 U.S. 414, the Supreme Court held exempt from a sales tax levied by New York City deliveries of fuel oil refined from crude petroleum imported and confined to warehouses under bond as provided for under the above statutes and the federal regulations made pursuant thereto. The court pointed out at pages 425 and 426 that ''From the time of importation until . . . laden on vessels engaged in foreign trade, the imported petroleum and its product, the fuel oil, is segregated from the common mass of goods and . . . is subject to the supervision and control of federal customs officers.'' The court made it clear that the oil remained separate from the mass of property subject to the tax upheld under the commerce clause in *McGoldrick* v. *Berwind-White Coal Min. Co., supra,* 309 U.S. 33.

The court determined that the statutes and multiple regulations involved in *Gulf Oil* represented a comprehensive regulation of *imported oil.* The enactments, including customs regulations specifically exempting imported goods in bonded warehouses from state taxation and deemed incorporated by reference into the Tariff Act of 1930, ''. . . afford a comprehensive scheme for the regulation of the *importation* of the crude petroleum and of its control while in the course of manufacture in bond into fuel oil and its delivery as ships' stores. . . .'' The local tax conflicted with congressional policy, for ''Congress *provided for the segregation of the imported merchandise''* in furtherance of the purpose of relieving the ''*importer of the import tax* so he might meet foreign competition in the sale of fuel as ships' stores.'' (Pp. 426-428, *italics added.*)

The *Gulf Oil* case demonstrates that Congress intended to occupy only a limited field outside of which state regulations are not forbidden or displaced. (See *Kelly* v. *Washington, supra,* 302 U.S. 1, 9.) It is clear that the statutes invoked by Shell as construed in *Gulf Oil* do not purport to limit even the right of the federal government to levy taxes on sales of domes-

tically produced fuel oils from ordinary stocks, and certainly they are too circumscribed in their language and purpose to be deemed to occupy the field or conflict with the California sales tax imposed against the sales in the instant case.

The taxpayer has thus failed to demonstrate the invalidity of the tax in any respect. Accordingly, the judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Burke, J., and White, J.,* concurred.

McCOMB, J., Concurring and Dissenting.—I would reverse that portion of the judgment denying a refund of sales taxes on fuel oil sold as ships' stores to vessels engaged exclusively in the export trade, for the reasons expressed by Mr. Justice Friedman in the opinion prepared by him for the District Court of Appeal in *Shell Oil Co.* v. *State Board of Equalization* (Cal.App.) 46 Cal.Rptr. 653.

In all other respects I would affirm the judgment.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.