**HESS OIL VIRGIN ISLANDS CORP., Petitioner**

**v.**

**LEROY A. QUINN, Commissioner of Finance, Government of the Virgin Islands, Respondent**

Civil No. 27/1978

District Court of the Virgin Islands

Div. of St. Thomas and St. John

August 23, 1979

EVERETT B. BIRCH, ESQ., of Counsel (BIRCH, DEJONGH & FARRELLY), St. Thomas, V.I., *for petitioner*

IVE A. SWAN, Attorney General, ALAN E. COBB, ESQ., Deputy Assistant Attorney General, of Counsel (Department of Law), St. Thomas, V.I., *for respondent*

CHRISTIAN, *Chief Judge*

OPINION

The Court is here called upon to determine whether or not Hess Oil Virgin Islands Corp. (sometimes HOVIC, petitioner, or Hess) is liable to the Government of the Virgin Islands (the Government) for gross receipts taxes on sales of bunker fuel oil sold by Hess to certain ships docked at Hess' facilities during relevant calendar years.

On August 18, 1977, respondent made a preliminary determination that petitioner was indebted to the Government of the Virgin Islands for gross receipts taxes on sales of bunker fuel made for the period July 1, 1974, to June 30, 1977, totalling $821,263.00, and a deficiency assessment for the period July 1, 1974, through December 31, 1974, in the sum of $171,696.74. Petitioner presently seeks a declaratory judgment, that the assessment against it for gross receipts taxes on the sales of bunker oil violates the

provision of what we shall hereafter refer to as the Hess Agreement.[1]

By Act No. 1524 (Bill No. 2639), approved September 1, 1965, the Legislature of the Virgin Islands had authorized the Governor of the Virgin Islands to execute a certain agreement with HOVIC (1965 V.I. Session Laws, p. 487). That agreement, attached to the Act, was therein adopted by reference and by such reference made a part of the Legislation. It was, in fact, duly executed by the Governor of the Virgin Islands in that very form on September 1, 1965.

Prior to trial the parties stipulated to most of the pertinent facts. For the purpose of resolving the remaining factual questions, a hearing was held on April 18, 1979.

## I.

The portion of the Hess Agreement with which we are here concerned is section 4(A). The relevant portions of that troubling section read as follows:

### 4. Tax Exemptions and Subsidies

(A) Hess and such of its Affiliates as are engaged in constructing, owning and/or operating, in whole or in part, the Oil Refinery and Related Facilities, shall for a period of sixteen (16) years from the date of the Government's execution of this Agreement be exempt from payment of all taxes, excises, duties, imposts and exactions imposed by or with the consent of the Government, or any subdivision, agency or instrumentality thereof, on construction, ownership, operation, maintenance, expansion or other activity in respect of the Oil Refinery and Related Facilities and materials, work in process and products thereof (including importing, exporting, loading, unloading, storing, processing, blending, manufacturing, producing and sale of oil, oil products or by-products including petro-chemicals, or any other raw material or products of, or any equipment or machinery imported for use at, the Oil Refinery and Related Facilities). *The foregoing exemption shall include specifically exemption from:* . . .

---

[1] Petitioner also sought to have execution by the Government stayed, pending the outcome of this suit.

(iv) *all* excise and *gross receipts taxes in respect of exports* or sales of products or hire or use of property.

*The foregoing exemption shall not be applicable* . . . (3) *to gross receipts* and excise (including gasoline) *taxes* imposed in respect of (i) *sales in the Virgin Islands not for export to persons other than Hess and its Affiliates,* or (ii) receipts from the hire or use of property within the Virgin Islands from persons other than Hess and its Affiliates . . . (emphasis added).

Unquestionably, the foregoing provisions granted Hess an exemption from all gross receipts taxes on exports. Equally free of doubt is that specifically excluded from the grant are gross receipts taxes on sales in the Virgin Islands which are not for export and are made to persons other than Hess and its affiliates.

On the record before the Court, by stipulation and testimony, it appears that in the very early stages of Hess' operation under its agreement with the Government, Hess commenced selling bunker fuel to ships involved in transporting petroleum products to and from its refinery on St. Croix. The bunker oil is used by those vessels as fuel to propel them to their various destinations. The parties have stipulated that during the relevant period, July 1, 1974, through June 30, 1977, sales of this fuel oil were made in the Virgin Islands to unrelated third parties (that is to say, other than to Hess or an affiliate of Hess) for use on ships at sea. If these sales are to bear the impost of the gross receipts tax, the Government must satisfy each tine of a three-prong test, namely, (a) that the sales were made in the Virgin Islands; (b) that such sales were made to third parties other than Hess or its affiliates; and (c) the said sales were not for export. It is abundantly clear from this record before the Court that the first two components of that standard have been fully satisfied by the Government. It remains to be seen whether or not such sales of bunker fuel to these ships for consumption at sea are "not

385

for export" within the meaning of section 4(A)(iv)(3) of the Hess Agreement.

As authority for the proposition that the word "export" defined as a verb means to carry or to send abroad, petitioner cites the Court to Black's Law Dictionary (Revised Fourth Ed., 1968). Armed with this definition, petitioner contends that since the bunker fuel oil is sold with the intention and expectation that the major portion of it will be removed and carried out of the Virgin Islands it is an export sale and, thus, not subject to the gross receipts tax under section 4(A)(iv)(3) of the Hess Agreement. Countering, respondent refers the Court to the case of Swan & Finch Company v. United States, 190 U.S. 143 (1903). In that case the Supreme Court, concerned with a statutory "drawback" on the exportation of an article, held that because oil consumed as ship's stores was not an export, the supplier of such oil was not entitled to a refund of import duties paid on the importation of the oil. The High Court there stated:

Whatever primary meaning may be indicated by its derivation, *the word "export" as used in the Constitution* and laws of the United States, generally means the transportation of goods *from this to a foreign country.* . . . "Exportation is a severance of goods from the mass of things belonging to this country *with an intention of uniting them* to the mass of things belonging to some foreign country." . . . It cannot mean simply a carrying out of the country, for no one would speak of goods shipped by water from San Francisco to San Diego as "exported," although in the voyage they are carried out of the country. Nor would the mere fact that there was no purpose of return justify the use of the word "export." Coal placed in a steamer to be consumed in propelling that steamer to San Diego would never be so designated. *Another country or state as the intended destination of the goods is essential to the idea of exportation.* Swan & Finch Co. v. United States, supra, at 144–45 (emphasis added).

The Swan definition of the word "export", i.e., the severance of goods from the mass of things belonging to this

country with an intention of uniting them to the mass of things belonging to some other country, has been consistently followed throughout the years.[2] See Hugo Stinnes Steel & Metals Co. v. United States, 453 F.Supp. 94 (U.S. Cust. Ct. 1978); Shell Oil Company v. State Board of Equalization, 51 Cal. Rptr. 524, 414 P.2d 820 (Cal. 1966), appeal dismissed, 386 U.S. 211 (1967). Plaintiff in Shell Oil Company, supra, sought to recover a refund on sales and use taxes collected on the sales of bunker fuel oil to vessels engaged in interstate and foreign commerce, contending that such taxes were proscribed by the import-export and commerce clauses of the United States Constitution.[3] In order to determine whether the taxes violated the import-export clause, it was necessary for the California Supreme Court to first decide whether bunker oil sold to be consumed by ships as they ply the oceans was an article of "export" within the meaning of that clause. Relying on Swan & Finch Co., supra, the California Court held that such sales were not "exports" within the meaning of the import-export clause. Id. at 824. In the case at bar, if we were to adopt the Swan definition of the word "export", as used in the phrase "not for export", as the proper definition applicable to that term in cases dealing with the imposition of taxes, then the conclusion would be inescapable that the instant local sales of bunker fuel by HOVIC to ships other than its own or those of its affiliates, albeit for the consumption for those ships at sea, are "not for export" and thus, not exempt from the incidence of the Virgin Is-

---

[2] Petitioner would deprecate Swan for old age. However, petitioner would do well to show more respect for this still fertile septuagenarian in light of its numerous and still increasing progeny.

[3] The import-export clause provides "no state shall, without the consent of Congress lay any Imposts or Duties on Imports or Exports . . . ." (U.S. Const., Art. I, § 10, Cl. 2.)

The commerce clause provides that Congress shall have the power "to regulate commerce with foreign nations, and among the several states . . . ." (U.S. Const., Art. I, § 8, Cl. 3.)

lands gross receipts tax under section 4(A)(iv) of the Hess Agreement.

■■ The Court is mindful, as urged by petitioner, that the above-cited cases construed the word "export" in the context of various relevant Congressional acts or Constitutional provisions. Hess urges that the term "export" (or "not for export") must likewise be construed in light of the purpose sought to be achieved within the context of the Hess Agreement. But viewing section 4(A) in its entirety, it is clear that the petitioner was granted a broad exemption from gross receipts taxes, subject only to the certain exceptions stated. The exception here relevant is to be found in subdivision (3) of subsection (iv) of section 4(A). That provision excepted two sales or incoming monies from gross receipts and excise tax exemption. Firstly, the one sought to be invoked here by the Government, that is, local sales to unrelated third parties which are not for export, and secondly, receipts from unrelated third parties covering the hire or use by Hess or its affiliates of property within the Virgin Islands. The thrust of the exception which presently confronts the Court from the broad gross receipts exemption granted is to subject Hess to gross receipts taxes to the same extent that all other merchants are taxed on sales locally transacted with unrelated entities. Therefore, to the extent that Hess makes sales locally which bear all the indicia of a local business operation, such sales are subject to gross receipts taxes. Applying this analysis to the local sales of bunker fuel oil to ships other than those belonging to Hess or its affiliates, it becomes readily apparent that such sales are essentially local business transactions. The fuel oil purchased by the ships is only one item of the many ship's stores purchased in port to sustain those ships on their outgoing voyages. Consequently, under the letter and spirit of section 4(A) of the Hess Agreement, HOVIC, as all other local suppliers of

ship's stores, is not exempt from the payment of gross receipts taxes on such sales. It is the conclusion of the Court, therefore, that the definition of the word "export" as expressed in Swan and the other cases cited is the true meaning of that term as used in section 4(A)(iv) of the Hess Agreement. Thus, sales of the fuel oil under consideration fall squarely within the exception of section 4(A)(iv) (3)(i) of the Agreement, and it follows that such sales are subject to gross receipts taxes, unless some other legal theory dictates otherwise.

## II.

Another position espoused by petitioner is that its tax exemption was total insofar as the operation of its oil refinery and related facilities are concerned. The argument runs thusly: shipping is an integral part of the refinery operation; the bunkering of vessels performing such services is likewise a necessary and integral part of the refinery operation; ergo, sales of bunker fuel to ships which have brought raw materials to Hess is exempt from all taxes including gross receipts taxes.

True, the first general sentence of section 4(A) of the Agreement speaks in terms of an exception from all taxes in respect of the operation of the oil refinery and the products thereof.[4] However, that general language must give way to the more specific grants and exemptions spelled out in detail in the following portions of that very provi-

---

[4] Hess and such of its Affiliates as are engaged in constructing, owning and/or operating, in whole or in part, the Oil Refinery and Related Facilities, shall for a period of sixteen (16) years from the date of the Government's execution of this Agreement be exempt from payment of all taxes, excises, duties, imposts and exactions imposed by or with the consent of the Government, or any subdivision, agency or instrumentality thereof, on construction, ownership, operation, maintenance, expansion or other activity in respect of the Oil Refinery and Related Facilities and materials, work in process and products thereof (including importing, exporting, loading, unloading, storing, processing, blending, manufacturing, producing and sale of oil, oil products or by-products including petro-chemicals, or any other raw material or products of, or any equipment or machinery imported for use at, the Oil Refinery and Related Facilities).

sion. As earlier noted, subsection (iv) of section 4(A) provides in detail what gross receipts taxes are excluded from the grant of exemption. Since the local sales of bunker fuel to unrelated third parties not for export are specifically not exempted from gross receipts taxes, the petitioner may not rely on general language in an effort to bring those bunker sales within the exception. Besides, as a general rule, grants of tax exemption are strictly interpreted against assertions of the taxpayer and in favor of the taxing authority. King Christian Enterprises, Inc. v. Government of the Virgin Islands, 5 V.I. 170, 345 F.2d 633 (3d Cir. 1965); State v. Fisch's Estate, 387 P.2d 282 (Colo. 1963); 3 Sands, Sutherland Statutory Construction § 66.09 (3d ed. 1974). As pointed out in Jones v. Iowa State Tax Commission, 74 N.W.2d 563 (Iowa 1956), "[t]axation is the rule and exemption therefrom the exception; and the claimant of such an exemption must show his right thereto by evidence which leaves the question free of doubt. The claimant for an exemption must show that his demand is within the letter as well as the spirit of the law". Id. at 565.

■ Furthermore, if there be any doubt concerning the proper construction of a revenue statute, then the construction which is most advantageous to the interests of the Government must be adopted. Swan & Finch Co. v. United States, supra, at 147; Blair v. Chicago, 201 U.S. 400 (1906).

■ The Hess Agreement granted an exception from gross receipts taxes on sales to Hess and its affiliates. The grant did not extend to sales to unrelated third parties. As to this, there is no disagreement. However, even were we to accept petitioner's contention that shipping and bunkering of those ships are integral parts of the refinery operation, the finding cannot be made that the sale of bunker fuel oil in question was made as a necessary part of the Hess Re-

finery operation. The record discloses that most of the sales of bunker fuel oil were of monthly quantities costing in excess of one million dollars. In October 1974, February 1975 and January 1977, the amount exceeded two million. Petitioner, however, has not come forward with evidence to demonstrate that sales of such magnitude related to the transportation of its products only. It may well be that the ship bringing crude oil to the St. Croix refinery fueled up and departed to service other customers in no way connected with Hess. In these circumstances, under the principles of law enunciated above, petitioner has not shown that it is entitled to the exemption, and doubts being resolved in favor of the Government, this contention of Hess remains unpersuasive.

## III.

Petitioner maintains further that the agreement between Hess and the Government ought to be construed as a contract between the parties rather than as a statute of general application. In this regard, petitioner posits that the rules of construction expressed above should not be applied; that the conduct of the parties should be given substantial weight in determining their intention and understanding, which according to HOVIC was to grant full and complete tax exemption on the operation of its oil refinery. This, in petitioner's view, necessarily includes the servicing of ships with bunker fuel.

In support of the above argument, petitioner correctly points out that every year from 1966 to the present, respondent has audited its books and records and was aware of the sales of bunker fuel oil to unrelated third parties for use by ships at sea. Though possessed of this knowledge, respondent, petitioner maintains, never sought to impose and collect gross receipts taxes on those sales throughout the first twelve years of the agreement. This conduct on the

part of the Government, petitioner argues, strongly suggests that the contracting parties understood such bunker sales to be encompassed within the exemption of section 4(A)(iv) of the Hess Agreement.

Although the Hess Agreement was not obtained through the channels of the Industrial Incentive Program, section 4(C) of the Hess Agreement provides that it "reflects such options of Subtitle 4 of Title 33 (Industrial Incentive Act) as have been deemed by the Government to be appropriate and consistent with the public interest. . . ." It is noteworthy that much of the same language of the Legislative Declaration of Policy and Purpose of Act No. 1524 also appears in section 4001 of Title 33 (Industrial Incentive Act). The latter statute also provides that the Government considers each order granting tax exemption thereunder "as being in the nature of a *contract* between said Government and the beneficiary". (Emphasis added.) Title 33 V.I.C. § 4001(b).

Since, then, grants of exemption under the Industrial Incentive Act are to be deemed contracts, and inasmuch as the overall purpose of the Hess grant is similar to that of the grants under the Industrial Incentive Act, it is reasonable to treat the cases construing grants of tax exemption and subsidies under the general act as applicable and bearing heavily on the construction of the Hess Agreement. On this basis the Court proceeds.

The case authority in this jurisdiction has decreed exemptions under the Industrial Incentive Act to be matters of Legislative grace and, thus, to be strictly construed against the taxpayer.[5] See Tracy Leigh Development Corp. v. Government of the Virgin Islands, 11 V.I. 244, 251, 501

---

[5] See Blair v. Chicago, 201 U.S. 400, that Court stating:

It is a matter of common knowledge that grants of this character are usually prepared by those interested in them, and submitted to the Legislature with a view to obtain from such bodies the most liberal grant of privileges which they are willing to give. This is one among many reasons why they are to be strictly construed.

F.2d 439, 443 (3d Cir. 1974); King Christian Enterprises, Inc. v. Government of the Virgin Islands, 5 V.I. 170, 178, 345 F.2d 633, 637 (3d Cir. 1965); cf. Antilles Industries, Inc. v. Government of the Virgin Islands, 11 V.I. 337, 388 F.Supp. 315 (D.V.I. 1975). Thus, the result obtained previously under the statutory interpretation will likewise prevail under the contractual analysis, as construed by courts reviewing like contractual grants under the Industrial Incentive Act, unless it can be found that the course of conduct of respondent in the non-collection of these taxes mandates a different result.

 Petitioner is correct in its contention that the past conduct of the respondent is relevant to the interpretation of the provision of the agreement granting an exemption from gross receipts taxes.

One of the most significant aids of construction in determining the meaning of revenue laws is the administrative interpretation given such act by the agency that is responsible for its administration and enforcement. 3 Sands, Sutherland Statutory Construction § 66.04 (3d ed. 1974).

On the record before the Court, however, it cannot be said that at any point during the life of the subject agreement, respondent formally adopted a position that sales of bunker fuel such as are relevant in this case were exempt from gross receipts taxes. See 33 V.I.C. § 1491. It is agreed that respondent's agents never attempted to collect gross receipts taxes on such sales even though they had knowledge of those sales. Nevertheless, such omission was not pursuant to any formal policy or determination. The first authoritative expression, of sorts, came not from the Commissioner of Finance, but from a Mr. Max Kirshner, then a technical advisor to the Department of Finance, in response to respondent's (then serving as Assistant Director of the Tax Division) request for a ruling as to the taxability of the bunker oil sale. Advisor Kirshner concluded that the

393

sale of bunker fuel to ships used for inter-ocean freight service is an export sale and not subject to gross receipts taxes.[6] Subsequently, the same agent who had earlier raised the question, upon auditing the books and records of Hess for 1975, once more brought up the matter of Hess' tax liability for gross receipts taxes on the bunker fuel sales. A second opinion was requested, this time from the Virgin Islands Department of Law. This latter opinion by Paul B. Kertman, Esq., Assistant Attorney General, dated April 19, 1977, concluded that the bunker oil sales were subject to gross receipts taxes. It was at this juncture that respondent took the official position that HOVIC was indebted to the Government for gross receipts taxes and filed the deficiency in question. Thus, although respondent made no attempt to collect gross receipts taxes on bunker oil sales of the type here involved prior to 1974, there was never a concensus on whether or not such sales were within the grant of exemption. The conduct of the examining governmental agents in failing to properly scrutinize these transactions to determine whether they were subject to gross receipts taxes does not amount to a manifestation by the Commissioner of Finance as to the taxability, vel non, of those transactions. See 33 V.I.C. §§ 1491, 1492; see also Country Gas Service v. United States, 405 F.2d 147 (5th Cir. 1969); Twitchco, Inc. v. United States, 348 F.Supp. 330 (M.D. Ala. 1972).

---

[6] This opinion of the technical advisor at least invited, if it did not demand, a request for a second evaluation of the situation. Not simply because of its ultimate conclusion, but more because of the route it followed in arriving at that destination. As Assistant Attorney General Paul B. Kertman pointed out in a later opinion, it was not that section 43 of Title 33 was inapplicable, but rather that the latter Act qualified and limited the application of section 43 insofar as Hess was concerned. More than that, to reach his conclusion the technical advisor, so to speak, put words in the mouth of the solons and the contracting parties as well, saying ". . . the parties intended that the product is to be *removed* or exported. . . ." The agreement spoke of *exporting*, never *removing*, the product. Then, too, the advisor went well beyond even petitioner's contention, determining ". . . that a sale of bunker fuel by Hess to a (any) vessel which is used for inter-ocean and/or inter-island freight or *passenger* service is an export sale."

The value of such conduct as an interpretative aid is, there-, fore, minimal if not altogether nil.

 ██ Neither would inaction on the part of respondent give rise to the equitable defense of estoppel which petitioner seeks to raise.[7] The Government is neither bound nor estopped by the unauthorized or incompetent acts of its agents which the law does not sanction or permit. See In re Hooper's Estate, 5 V.I. 518, 359 F.2d 569 (3d Cir. 1966). Respondent, having been mistaken as to the taxability of the sales of the bunker fuel oil in question, is not now barred by the doctrine of equitable estoppel from correcting that prior legal error.[8] See, e.g., Automobile Club of Michigan v. Commissioner of Internal Revenue, 353 U.S. 180 (1957); Twitchco, Inc. v. United States, 348 F.Supp. 330, 333 (M.D. Ala. 1972).

On all the foregoing, it is the conclusion of the Court that petitioner is liable to the Government of the Virgin Islands for gross receipts taxes for the period July 1, 1974, through

---

[7] Respondent contends that since petitioner did not raise estoppel in its pleadings it is now barred from raising it in its briefs. However, although estoppel is usually not available unless pleaded, United States v. Anthony, 231 F.Supp. 414 (D. Iowa 1964), Fed. R. Civ. P. 8(c) only requires estoppel to be raised affirmatively in pleading to a preceding pleading. Unless we consider the notice of deficiency by the Commissioner a pleading, a petitioner filing the original pleading in the Court might not be required to list all affirmative defenses. See Fed. R. Civ. P. 8(a). In any event, petitioner having raised the estoppel defense early in the proceeding and both sides having argued it extensively at the hearing of this case, the Court will overrule the objection and excuse any such defect.

[8] Petitioner contends that in reliance of the past conduct of respondent in not taxing the bunker sales, it did not include such taxes in its price for the oil. However, respondent is not seeking taxes over the entire life of the agreement but only retroactively to 1974. Therefore, on an equitable scale the Court is hard pressed to detect any substantial prejudice to Hess. The Court readily admits that this plea of inequity raised by Hess is a contention that gave the Court cause for serious concern. However, definitely since 1977 petitioner has been on actual notice of the Government's intention to make the assessment, and in the ways of persons of the business world, petitioner could have commenced to seek recoupment. Moreover, the Court has every reason to believe that petitioner was not the least bit unaware of the October 17, 1974, opinion of the technical advisor, and that, at the very time of its issuance. If this surmise be correct, then petitioner had knowledge from 1974 that the question was being raised. Forewarned, therefore, petitioner should have so forearmed itself as to stave off the loss which it now bewails.

June 30, 1977, in the amount claimed by the Government on those local sales of bunker fuel oil to ships other than those belonging to Hess or its affiliates.

